IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **DAVID ANTONIONO INVESTMENTS, LLC,**<br><br>            Plaintiff,<br><br>v.<br><br>**SANDY HUTCHENS,** a/k/a Fred Hayes, a/k/a Moishe Alexander, a/k/a Moshe Ben Avraham, a/k/a Mathew Kovce; **LAW OFFICES OF MANNY SINGH P.A.; MANMINDHERJIT SINGH;** and **GREAT EASTERN INVESTMENT FUND, LLC.,**<br><br>            Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, David Antoniono Investments, LLC ("Plaintiff" or "Antoniono Investments"), by its attorneys and for its Complaint, alleges as follows:

## I.  INTRODUCTION

1.      This action is about an advance fee real estate loan scam perpetrated by a notorious Canadian fraudster, aided and abetted by Florida professionals.  Plaintiff, a Texas real estate developer, was victimized in excess of half a million dollars.

2.      The advance fee loan fraud was organized and controlled by Defendant, Sandy Hutchens ("Hutchens").  At all relevant times and through the use of aliases and shell entities, Hutchens created the illusion that he was operating a *bona fide* real estate lending enterprise.  Through the conspiracy, substantial assistance, and concerted action engaged in by his family members, several lawyers and their law firms, at least one real estate agent and other

1

professionals, Hutchens has operated this scheme to defraud for many years, and his American and Canadian victims have paid in excess of $10 million thus far.  A certified class action brought against Hutchens, his wife, his daughter, and their Canadian co-conspirators is pending in the United States District Court for the District of Colorado entitled *CGC Holdings, LLC et al. v. Hutchens et al.*, Case No. 11-CV-01012-RBJ-KLM (the "Colorado Action").  However, the class period in the Colorado Action runs only until April 7, 2013, and the fraud perpetrated against Plaintiff Antoniono Investments occurred in late 2013 and early 2014, even as the Colorado Action was proceeding.  Other victims of Hutchens' schemes to defraud have brought other actions in courts around the United States and Canada.

## II.  THE PARTIES

3. Plaintiff is a Texas corporation with its principal place of business located at 26009 Budde Road, The Woodlands, Texas.  Thus, Antoniono Investments is a citizen of Texas.

4. Defendant Hutchens is a Canadian citizen and a resident of Toronto, Ontario, Canada.  As alleged herein, Hutchens has used many aliases, and presented himself as the chief executive of a number of fraudulent corporate entities that he has created to carry out his fraudulent schemes including, in the case of Antoniono Investments, Defendant Great Eastern Investment Fund, LLC ("Great Eastern").  In addition, Hutchens owns or controls various entities or accounts to which the net proceeds of the advance fees paid by victims, including Antoniono Investments, were transferred.

5. Defendant Great Eastern is a Delaware limited liability company with its principal place of business purported to be located at 300 International Drive, Suite 100, Williamsville, New York 14421.  Thus, Great Eastern is a citizen of Delaware and New York.

6. Defendant Law Offices of Manny Singh P.A. ("Singh Law Offices") is a Florida

law firm with its offices located at 6610 North University Drive, Tamarac, Florida.  Thus, Singh Law Offices is a citizen of Florida.

7.  Defendant Manmindherjit Singh ("Singh") is a Florida resident and citizen and the principal of Singh Law Offices.  All acts and omissions carried out by Singh alleged in this Complaint were done in his capacity as principal of the Singh Law Offices.

### III.  JURISDICTION AND VENUE

8.  This Court has jurisdiction over the subject matter of this action pursuant to (a) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1964 and 1965; (b) 28 U.S.C. § 1331, because the matter involves a federal question; and (c) 28 U.S.C. § 1332(a), because Plaintiff is a citizen of Texas and the Defendants are all citizens of states or countries other than Texas, and the matter in controversy exceeds $75,000.

9.  Venue is proper in this District pursuant to RICO, 18 U.S.C. §§ 1964 and 1965, as well as 28 U.S.C. § 1391(b), because some of the acts giving rise to the violations alleged of in this Complaint occurred in this District, and some of the Defendants reside in this District.

### IV.  GENERAL ALLEGATIONS

#### A.  The Hutchens Advance Fee Loan Fraud Ring

10.  Hutchens' criminal record goes back more than twenty years.  His most recent criminal conviction in Canada was in April 2005 for three counts of fraud.  As a general matter, rational people do not want to enter into financial transactions with career criminals, particularly transactions where they are required to advance substantial funds as a condition to qualify to receive a loan.  To disguise his criminal past, which could readily be found through an Internet search, at all relevant times Hutchens used numerous aliases, including "Fred Hayes," "Moishe Alexander," "Moshe Ben Avraham," "Alexander MacDonald," "Frederick Merchant," "Mathew

Kovce," and others. Upon information and belief, Hutchens continues to use at least some of those aliases. Hutchens *never* used his true name in *any* of his dealings with Plaintiff or the other victims of his schemes to defraud.

11. Around the time of his 2005 fraud conviction described above, Hutchens launched an advance fee loan fraud operation under the auspices of an entity he created and called Canadian Funding Corporation ("CFC"), which he had incorporated on January 28, 2004. For the same purpose, he subsequently incorporated an entity he called 308 Elgin Street, Inc. ("308 Elgin") on October 27, 2006, and one he called First Central Mortgage Funding Inc. ("FCMF") on December 12, 2006. Several years later, around the time that the Colorado Action was commenced and after newspapers such as the *Toronto Star* and Internet websites such as "Ripoff Report," the "Jewish Whistleblower," and others began to publish information exposing Hutchens and his use of CFC, 308 Elgin and FCMF to carry out his scheme, Hutchens, using his Mathew Kovce alias, incorporated Great Eastern, on March 28, 2011.[1]

12. The victims of the Hutchens advance fee loan fraud are persons or entities who require financing for real estate transactions. These persons or entities were in the market seeking loans to be collateralized by the real estate being purchased and, to that end, engaged the services of various mortgage brokers located throughout the United States. The mortgage brokers, in the ordinary course of the mortgage brokerage business, obtained loan applications and related materials from these borrowers, which were transmitted via the U.S. Mails and/or interstate wire facilities to one of the Hutchens-controlled entities, CFC, FCMF, 308 Elgin, or Great Eastern.

---

[1] An affidavit was submitted to the court in the Colorado Action averring that there is a real "Mathew Kovce," that he lives with Hutchens' daughter Jennifer, and that he has an agreement with Hutchens pursuant to which Hutchens is allowed to use his name fraudulently for one percent of the money generated by deals that are done.

4

13. The mortgage brokers and borrowers entered into their transactions under the impression that they were dealing with a real person variously identified as "Fred Hayes," "Moishe Alexander," "Moishe Ben Avraham," "Moshe Ben Avraham," "Alexander MacDonald," "Frederick Merchant," "Alexander MacDonald," "Mathew Kovce," and others, all of whom claimed to be the Chief Executives of purportedly legitimate entities CFC, FCMF, 308 Elgin, or Great Eastern. In reality, however, the victims were actually dealing with Hutchens (sometimes aided by his daughter, Jennifer Hutchens, who also used an alias, "Jennifer Araujo") and a web of his fraudulent corporate entities.

14. The business of CFC, 308 Elgin, FCMF, and Great Eastern was and is the issuance of loan commitments and the collection of substantial advance fees. *None* of these companies had the capacity, or the intent, to fund the real estate loans to which they committed.

15. Hutchens incorporated another entity, First Central Holdings, Inc., to receive interstate wire communications (namely, wire transfers of funds) from applicants. Hutchens or his wife, Tanya Hutchens, acting at Hutchens' instruction, wrote all of the letters issued and sent by CFC, FCMF, 308 Elgin, and Great Eastern purporting to commit loans to applicants.

16. As part of their scheme to defraud Plaintiff and other victims, Hutchens and Tanya Hutchens also own or control at least thirty Ontario corporations and limited liability companies, or accounts under fictitious names, to which they transfer the net proceeds of the advance fee fraud (the "Transferee Accounts").

17. The net proceeds of the advance fees paid by applicants, including Plaintiff and the other victims of the scheme to defraud, were transferred to Hutchens or to Tanya Hutchens or to the Transferee Accounts.

18. CFC, FCMF, 308 Elgin, and Great Eastern, as the case may be, issued

commitments to loan money to applicants.

19. These loan commitments provided that, as a condition for closing on the respective commitment, substantial fees, characterized as "lender's legal fees," "lender's administrative fee," "inspection fee," and "brokerage fee" were to be paid in advance. After the applicant paid the "inspection fee," Hutchens typically arranged for an "inspection" of the prospective collateral. Invariably, these reports found that the property would constitute sufficient collateral for the proposed loan.

20. Upon the issuance and transmittal of the "Inspection Report," Hutchens or Jennifer Hutchens issued wiring instructions for the legal and administrative fees to be wired to one of the accounts under the name of FCMF, CFC, 308 Elgin, FCH or Great Eastern. In most cases, the inspection fees were paid by the borrower directly to the "inspector."

21. Over the years, the Hutchens entities committed to loans worth hundreds of millions of dollars, and collected advance fees in excess of $10 million. To Plaintiff's knowledge, the Hutchens entities closed on only a handful of loans over that time, with the largest being a condominium loan in Florida in the amount of $265,000.

22. Deep into the loan application process of each loan, Hutchens invariably found fault with the loan applications and materials submitted in support thereof by the borrowers and the loan brokers, or with the property offered as collateral. Then, and also invariably, Hutchens imposed additional terms and conditions, often including a demand for additional fees and, in time, invariably found that the applicant had failed to satisfy these new terms and conditions. Hutchens then pointed to the trumped-up defects which he allegedly found as grounds for terminating the loan application process. Upon the loan application being terminated, Hutchens kept all of the monies which had been advanced, claiming that the fees had been earned and were

nonrefundable, and refused to give any of it back to the borrowers.

23.     The activities of FCMF, CFC, 308 Elgin, FCH, Great Eastern and the Transferee Accounts were conducted from the home of Hutchens, Tanya Hutchens, and Jennifer Hutchens in Toronto, Ontario.  None of the various Hutchens Entities maintained a separate office out of which lending activities were conducted, although they all had separate physical addresses.  These physical addresses gave the impression that these entities were actual lenders with real places of business from which to conduct a lending operation.  The truth is that all of the physical addresses used were nothing more than rental mail boxes.

24.     At no time did FCMF, CFC, 308 Elgin or Great Eastern have the capacity, the ability, or the intent to fund the loans which had been committed.

        **B.**     **Antoniono Investments' Loan Transactions**

25.     The process by which Hutchens and his confederates defrauded Antonino Investments was precisely the same as the other victims of the Hutchens' fraud.

26.     In 2013, the President of Antoniono Investments, David Antoniono ("Antoniono"), had commenced working on the development of three separate condominium projects in the Midtown area of Houston, a prime area presently undergoing much renovation and redevelopment.  Antoniono is an experienced developer: over the past 24 years, he and his companies have successfully have developed over $100 million of office, retail, warehouse, medical office facilities, and other commercial properties, primarily in the Houston area.

27.     Because the price of conventional financing for such projects remained high in 2013, Antoniono began exploring alternative funding sources.  In September 2013, this search led Antoniono to a broker for such funding sources, Dennis Downing ("Downing") of Commercial Capital Limited, located in Martinez, California.

28. Downing, through Internet searches, became aware of Great Eastern, and discovered that Great Eastern was purporting to be a private lender with substantial funds available for real estate loans. Downing introduced Antoniono to Mathew Kovce, who claimed that he was the Managing Member of Great Eastern. Unbeknownst to Downing or Antoniono, "Mathew Kovce" was Hutchens using one of his many aliases.

29. "Mathew Kovce" (Hutchens) expressed interest in all three of Antoniono Investments' Midtown projects, in the total amount of approximately $21 million. By October 10, 2013, Great Eastern, Downing and Antoniono Investments had entered into three agreements and letters of intent that set forth the terms and conditions under which Great Eastern would provide this financing.

30. In connection with those agreements, Antoniono Investments paid to Great Eastern a total of $306,000 in loan advance fees, legal fee retainers, title company commitment fees, and loan brokerage fees.

31. In late October 2013, as Antoniono Investments was providing documentation and related information to "Mathew Kovce" and Great Eastern in connection with the three Midtown project loans, Antoniono became aware of a potentially lucrative opportunity to build a medical services office complex on the near west side of Houston. The scope of this project was substantially greater than his Midtown projects, and to do them Antoniono Investments would need a far greater amount of financing than he was arranging on the three Midtown projects — at least $100 million.

32. Again, "Mathew Kovce" expressed a high degree of interest in providing financing for the medical complex project, even to the point of assuring Antoniono that Great Eastern's investors *preferred* such large projects. "Mathew Kovce" arranged for Great Eastern's

8

attorney, Defendant Singh, to fly from Florida to Houston, Texas, to meet with Antoniono and perform due diligence on the medical complex project.

33.     At that time, Singh assured Antoniono that he had represented Mathew Kovce and Great Eastern for a long period of time and that they were capable and experienced in providing this level of financing for the project.

34.     Thus assured, shortly after Singh's visit Antononio entered into a fourth agreement and letter of intent with Great Eastern to cover the financing of the medical complex project.  In connection with this agreement, Antoniono paid $262,500 in advance loan fees, legal retainer fees, and title commitment fees to Great Eastern.

35.     On the four projects combined, then, Antoniono Investments paid a total of $545,500 to Great Eastern for loan advance fees ($506,500), legal retainer fees for Singh's services ($27,500), and title commitment fees purportedly required by an entity called Hollywood Title Services, LLC ($12,000).  In addition, Downing and Commercial Capital Limited received $22,500 in loan brokerage fees on the three Midtown projects.  Antoniono Investments' total out-of-pocket costs for the Midtown projects and the medical complex project came to $568,000.

36.     The total loan commitment agreed to by Great Eastern was $121,017,000.

37.     After paying these fees, Antoniono and Antoniono Investments continued the process of providing the extensive documents and related information to Great Eastern that are customarily provided in connection with closing such financing arrangements.  Because Antoniono has over two decades of experience developing commercial real estate, he and his companies, including Antoniono Investments, are highly experienced in processing the type of documentation and information required by prospective lenders and investors, all of which they

provided to Great Eastern.

38.     By early December, 2013, Mathew Kovce had become increasingly non-responsive, and had begun to impose additional conditions and requirements on the financing that Great Eastern was supposed to be providing, and Antoniono began to become suspicious.

39.     As a result, Antoniono had research performed on Mathew Kovce and Great Eastern.  He discovered that (a) Mathew Kovce was actually Hutchens, a convicted white-collar criminal known for defrauding entities like Antoniono Investments in advance loan fee scams; (b) Singh was a personal bankruptcy lawyer who had little or no experience in handling financing transactions of the type and nature that Antoniono Investments had contracted for with Great Eastern; and (c) Hollywood Title Services, LLC, the title company in Florida that, at Hutchens' direction, was sent the title commitment fees by Antoniono Investments, was a fictitious entity that had never existed and that its supposed owner, Bernard Feldman, was most likely fictitious and simply another front for Hutchens.[2]

40.     On December 17, 2013, Antoniono confronted Mathew Kovce in an e-mail, telling him that "[f]urther due diligence into your background has revealed troubling information regarding your true identity and your involvement in fraudulent activities."  Antoniono went on to direct Mathew Kovce to communicate only through Antoniono Investments' lawyer, and demand the return of the advance fees that Antoniono Investments had paid to Great Eastern.

41.     Hutchens' response, sent later on December 17, 2013, was mostly gibberish.  He continued to perpetrate the fraud that he was actually Mathew Kovce and that Great Eastern was

---

[2]     In fact, the address that Hutchens used when creating Hollywood Title Services and registering it with the Florida Department of State, Division of Corporations, 3701 N. 37th Avenue, in Hollywood, Florida, is not an address at all.  Another address listed by Hollywood Title in some communications, 3701 N. 29th Avenue in Hollywood, is actually "Ralph's International Market."

a legitimate lender.  He pointed to an court order entered in the Colorado Action concerning service of process on Great Eastern, and told Antoniono that this showed his, and Great Eastern's, exoneration by the Court, and he rambled on at length but incomprehensibly.

42.     Neither Antoniono Investments nor its lawyer heard again from Hutchens or any of his confederates after the December 17, 2013, e-mail exchange, except a single e-mail from Hutchens to Antoniono Investment's lawyer on January 6, 2014, indicating that he would be hearing from Sandy Hutchen's Houston-based attorney.  No such communication ever occurred.

43.     Inasmuch as Antoniono is a savvy businessman, he was able to arrange alternative financing on the three Midtown projects, which Antoniono Investments is proceeding to develop. Antoniono Investments was not able to arrange alternative financing on the medical complex project and, thus, it lost that opportunity.

### F.     CFC, FCMF, FCH, 308 Elgin, Great Eastern And The Transferee Accounts Are Alter Egos Of Hutchens.

44.     Hutchens controls CFC, FCMF, FCH, 308 Elgin and Great Eastern.  In addition, either directly or in conspiracy with his wife, Defendant Tanya Hutchens, he owns or controls all of the Transferee Accounts.  CFC, FCMF, FCH, 308 Elgin, Great Eastern, and the Transferee Accounts are sometimes referred to collectively as the "Alter Ego Entities."

45.     Hutchens operated the Alter Ego Entities as mere instrumentalities of himself and his advance fee fraudulent scheme.  The Alter Ego Entities were formed as subterfuges, to conceal Hutchens' identity and for the purpose of carrying out the advance fee scheme. Hutchens created, controlled and operated the Alter Ego Entities to defraud hundreds of victims, including Plaintiff.

46.     Hutchens' use and control of the Alter Ego Entities proximately caused the damages suffered by Antoniono Investments.

47. As a consequence, the corporate form of the Alter Ego Entities should be disregarded and Hutchens should be held personally liable on the claims of Plaintiff.

### G.     Damages Suffered By Antoniono Investments

48. Antoniono Investments has suffered the following damages for which it seeks compensation in this action:

(a) Monies that were paid by check or by wire for:

   i. Legal fees for the purpose of compensating Singh and Singh Law Offices;

   ii. Title fees paid to Hutchens under the guise of Hollywood Title Services, LLC, a fraudulent entity;

   iii. Administrative fees paid to Hutchens for the purpose of compensating Great Eastern; and

   iv. Brokerage fees paid to Downing;

(b) Additional costs incurred for securing financing for the three Midtown projects;

(c) Costs and expenses incurred in compiling loan documentation, and in responding to the constantly changing demands of Hutchens; and

(d) Damages for the loss of the hospital project.

### FIRST CLAIM FOR RELIEF

**Violations of the Racketeer Influenced and
Corrupt Organizations Act ("RICO"),
18 U.S.C. § 1961 *et seq*.**

49. Paragraphs 1-48 of this Complaint are incorporated by reference. This claim, which asserts violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, is asserted against each of the Defendants.

50. Defendant Hutchens, acting directly or indirectly, conducted the affairs of an association-in-fact enterprise and knowingly participated in a pattern of racketeering activity that affected interstate or foreign commerce, in violation of 18 U.S.C. § 1962(c). In addition, as alleged herein, Hutchens conspired with others to do so, in violation of 18 U.S.C. § 1962(d).

51. At all relevant times, CFC, FCMF, FCH, 308 Elgin, and Great Eastern were associated-in-fact as an "enterprise," within the meaning of 18 U.S.C. § 1961(4).

52. At all relevant times, the above-referenced association-in-fact enterprise was managed, and its affairs were conducted, by Hutchens.

53. At all relevant times, Hutchens conspired with others, including Defendants Singh and Singh Law Offices, to conduct the affairs of the above-referenced association-in-fact enterprise, in violation of 18 U.S.C. § 1962(d).

54. The role of each member of the above-referenced association-in-fact enterprise was as follows:

   (a) CFC, FCMF, 308 Elgin and Great Eastern each issued commitments for loans that required fees in advance without the present or foreseeable ability to fund such loans;

   (b) FCH, CFC, FCMF, 308 Elgin, and Great Eastern received, by wire transfer, advance fees from consumers of loans, including Plaintiff, as required by the loan commitments which had been made; and

   (c) The net proceeds of the advance fee scheme were transferred to the Transferee Accounts.

55. Hutchens engaged in predicate acts of racketeering activity in order to issue loan commitments so that he could fraudulently acquire funds from persons desiring to obtain

financing for real estate.

56. The above-referenced racketeering activity, as that term is defined in 18 U.S.C. § 1961(1)(B), included (a) acts of mail fraud, in violation of 18 U.S.C. § 1341; (b) acts of wire fraud, in violation of 18 U.S.C. § 1343; and (c) violations of the Travel Fraud Act, 18 U.S.C. § 2314.  For example, Hutchens and the other Defendants  committed and/or conspired to commit, violations of the federal wire fraud statute when, for the purpose of executing the advance pay fraudulent scheme and to obtain money by false and fraudulent pretenses, through false representations and false promises, they knowingly caused, and aided and abetted others to cause, to be transmitted in interstate or foreign commerce, from and to Florida, California, and other States, and from and to their locations in Canada, by means of wire communications, certain signals and sounds, in connection with, and in furtherance of, the enterprise, all as set forth above.  Hutchens committed acts in violation of the Travel Fraud Act when, having devised or intending to devise the advance pay fraud, or for obtaining money by means of false or fraudulent pretenses, representations, or promises, transported or caused to be transported in interstate or foreign commerce various persons, including loan broker Ron Schmitz from Florida to Ontario, Canada, to meet with Moishe Alexander and to be assured of his allegedly *bona fide* lending activities.

57. The pattern of racketeering activity, as that phrase is defined in 18 U.S.C. § 1961(5), included correspondence, telephone calls, facsimile transmissions, and e-mail messages between Hutchens, Tanya Hutchens, and Jennifer Hutchens, from offices located in Toronto, Ontario, on the one hand, and loan brokers and potential borrowers, including Antoniono Investments, located throughout the United States, on the other hand, plus wire transfers of money from Plaintiff and hundreds of other victims to accounts controlled by Hutchens, to wit:

14

(a) Hutchens, using various alias names but never his own, represented himself to be the chief executive officer of, and employed by CFC, FCMF, 308 Elgin, FCH, and Great Eastern;

(b) Tanya Hutchens, under Hutchens' control, wrote all or virtually all of the loan commitment letters;

(c) Jennifer Hutchens, under Hutchens' control, using the alias name of Jennifer Araujo, represented herself to be the Manager of Underwriting for CFC, FCMF, 308 Elgin, and Great Eastern;

(d) Hutchens caused loan commitments to be issued to Plaintiff and the other would-be borrowers;

(e) By means of the correspondence, telephone calls, facsimile transmissions, and e-mail messages from an office located in Toronto, Ontario, to loan brokers and to potential borrowers located in the United States, Hutchens represented that CFC, FCMF, 308 Elgin, and Great Eastern, as the case may be, were lenders with the ability to fund loans which had been committed;

(f) Hutchens owns the Transferee Accounts to which were transferred the net proceeds of the advance fees paid by Plaintiff and the other victims of the scheme to defraud;

(g) When called upon to do so, Defendant Singh, as principal of the Singh Law Offices, made numerous false and misleading representations:

    i. That Hutchens, using his alias Mathew Kovce, was a reputable businessman;

    ii. That Great Eastern was a *bona fide* lender;

15

        iii.    That Mathew Kovce and Great Eastern had closed numerous real estate loans; and

        iv.    That Great Eastern had the capacity to close the loan commitments which had been made to Antoniono.

58.    Hutchens, as well as the other members of the conspiracy, knowingly received the proceeds from the above-referenced pattern of racketeering activity in the operation of the enterprise by the payment of fees to each of them plus the transfer of the net proceeds of the fraud to the Transferee Accounts for the use and benefit of Hutchens. From Antoniono Investments alone, Hutchens received over $500,000 in advance fees.

59.    During the ten calendar years preceding the date hereof, all of the Defendants named herein did cooperate jointly and severally in the commission of two or more of the predicate acts that are set forth in 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of 18 U.S.C. § 1962(c). Further, such predicate acts were intentional with a threat that their respective racketeering activities would continue in violation of 18 U.S.C. § 1962(c).

60.    Plaintiff has been damaged as a direct and proximate result of Defendants' violations of Section 1962 of RICO, as alleged herein.

61.    Plaintiff is entitled to relief pursuant to 18 U.S.C. § 1964(c) in order to make it whole.

62.    Plaintiff is entitled to a judgment against Defendants, jointly and severally, in the amount of the damages suffered, trebled pursuant to 18 U.S.C. § 1964(c), together with attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**

(Negligent Misrepresentation)

63.    Paragraphs 1-48 of this Complaint are incorporated by reference. This claim is

16

asserted against Defendants Singh and Singh Law Offices.

64. As alleged in this Complaint, Defendants Singh and Singh Law Offices gave false information to, or withheld adverse information from, Plaintiff, in the course of a business transaction in which these Defendants had a financial interest.

65. The information misrepresented to and withheld from Antoniono Investments, specifically that Hutchens and Great Eastern were not in the business of making real estate loans, that they had no capacity to make such loans, that they had not closed on loans with the involvement of these Defendants, were all material facts.

66. Singh and Singh Law Offices either knew that the representations were false, made the misrepresentations without knowledge of their truth or falsity, or should have known that the representations were false.

67. Singh and Singh Law Offices intended to induce Plaintiff to act on the misrepresentations, by going ahead with the supposed loan transaction and paying advance fees and legal fees.

68. As alleged herein, Antoniono and Antoniono Investments relied on information supplied by Singh and Singh Law Offices.

69. Because of these Defendants' legal role, and their access to superior information concerning Great Eastern and Hutchens, and because of their specific representations about representing these Defendants in successful loan transactions in the past, Antoniono Investments' reliance was justifiable.

70. Antoniono Investments' reliance on the information supplied by Singh and Singh Law Office was a direct and proximate cause of damage to Plaintiff.

## **THIRD CLAIM FOR RELIEF**

(Violation of the Florida Deceptive and Unfair Trade Practices Act,
Fla. Stat. Ann. § 501.204 *et seq.*)

71.     Paragraphs 1-48 of this Complaint are incorporated by reference.

72.     This claim is asserted against each of the Defendants. The actions and misrepresentations of Hutchens, Singh, and Singh Law Offices constitute deceptive and unfair acts and practices within the meaning of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204 *et seq.* ("FDUTPA").

73.     The deceptive and unfair practices carried out by Hutchens, Singh and Singh Law Offices, as alleged in this Complaint and in violation of FDUTPA, caused Antoniono Investments to pay advance fees, under circumstances where no loans were actually available or intended.

74.     As a result of the deceptive and unfair practices alleged above, Antoniono Investments has suffered damages in amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands the following relief:

Judgment in its favor and against the Defendants, jointly and severally, for three times such sums as may be determined at trial, other available statutory damages, punitive or exemplary damages, attorneys' fees, costs, pre-judgment and post-judgment interest; and

For all such other and further relief as to this Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury pursuant to FED. R. CIV. P. 38(b).

DATED:  June 10, 2015

SHEPHERD, FINKELMAN, MILLER & SHAH, LLP

By  *Scott R. Shepherd*
   Scott R. Shepherd (ID # 69655)
   Nathan C. Zipperian (ID # 61525)
   1640 Town Center Circle, Suite 216
   Weston, FL  33326
   Telephone:  (954) 515-0123
   E-mail:  sshepherd@sfmslaw.com
              nzipperian@sfmslaw.com

   Kevin P. Roddy (to be admitted *pro hac vice*)
   WILENTZ, GOLDMAN & SPITZER, P.A.
   90 Woodbridge Center Drive, Suite 900
   Woodbridge, NJ  07095
   Telephone:  (732) 636-8000
   E-mail:  kroddy@wilentz.com

   **Counsel for Plaintiff**